Georgia A. Staton, Bar #004863
Ravi V. Patel, Bar #030184
Elizabeth B. N. Garcia, Bar #032209
JONES, SKELTON & HOCHULI P.L.C.
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone:  (602) 263-4486
Fax:  (602) 651-7584
gstaton@jshfirm.com
rpatel@jshfirm.com
egarcia@jshfirm.com

Attorneys for Defendants Pima County
Community College District; Michelle
Nieuwenhuis, an adult individual; Alex
Carranza, an adult
individual; Amy Montano, an adult individual;
David Rucker, an adult individual

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Carlos Carrillo, an adult individual,<br><br>                                    Plaintiff,<br><br>             v.<br><br>Pima County Community College District;<br>Michelle Nieuwenhuis, an adult individual;<br>Alex Carranza, an adult<br>individual; Amy Montano, an adult<br>individual; David Rucker, an adult<br>individual,<br><br>                                    Defendants. | No. 22CV00359-TUC-JAS<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

This case arises from Plaintiff Carlos Carrillo's encounter with two police officers investigating a reported sexual assault, and the Pima County Community College District's ("PCC") parallel Title IX and administrative investigation, which resulted in the termination of Carrillo's employment.  Pursuant to Rule 56, Fed. R. Civ. P. Defendants Pima County Community College District, Michelle Nieuwenhuis, Alex Carranza, Amy Montano, and David Rucker (collectively "Defendants"), move for summary judgment on Plaintiff's § 1983 claims against them because: (1) Carrillo's participation in a consensual interview with two officers does not implicate the Fourth Amendment; (2) Defendants did not violate

Carrillo's First Amendment rights by limiting his access to the campus during the course of the Title IX and criminal investigations, to ensure the safety of both him and the alleged victim; and (3) Plaintiff did not have any vested constitutional right in unearned income, but even if he had, he was not deprived of due process before he was restricted from teaching as an adjunct faculty member. Plaintiff's failure to establish any constitutional violation also mandates summary judgment on his *Monell* claim.   Finally, summary judgment is also warranted on Plaintiff's claims against Defendants Carranza, Montana, Nieuwenhuis, and Rucker, as each of these defendants is entitled to qualified immunity.

This Motion is supported by Defendants' Separate Statement of Facts ("DSOF") and attachments thereto, which are incorporated by reference.

I.     **RELEVANT BACKGROUND.**

   A.     **Carrillo Is Employed by Pima Community College.**

Carrillo was employed by Pima Community College District ("PCC"), as an Advanced IT Analyst, in 2015. [DSOF ¶ 1]. The following year, he was promoted to Director of Learning Management Systems ("LMS"). [*Id.* ¶ 2]. Carrillo's duties as Director of LMS did not include teaching any courses, but did require him to oversee several PCC employees. [*Id.* ¶¶ 3-4].   One of those employees was Ashley (Ophelia) Holguin. [*Id.* ¶ 4].   Ashley began working for PCC as a temporary IT Specialist in April 2020, after the pandemic forced the department to transition to remote work. [*Id.* ¶ 5]. Although she worked remotely during the initial months of the pandemic, Ashley had monthly one-on-one interviews with Carrillo who thought she was performing fine as a temp. [*Id.* ¶ 6].   In September 2020, Ashley was hired on a full-time basis. [*Id.* ¶ 10].   During Ashely's October 2020 review, Carrillo ordered Ashley to return to the office five days a week, citing her lack of access to technology. [*Id.* ¶ 7].

Until at least the end of February 2021, Carrillo required Ashley to work on-campus, where he was also working despite his having been asked to work remotely. [*Id.* ¶ 8]. Other employees in the department worked a hybrid schedule. [*Id.* ¶ 9]. In February 2021, Ashley began working a hybrid schedule, which no longer required her to come into the office every day. [*Id.* ¶ 11]. Ashley continued working a hybrid schedule until June 30, 2022, when

1    she was called into a meeting with Carrillo and her new supervisor David Fonseca, who had

2    decided to revoke her remote work status. [*Id.* ¶ 12]. Ashley refused to sign the revocation

3    form that Carrillo and Fonseca gave her and requested Human Resources' involvement. [*Id.* ¶

4    13].

5              **B.    Sexual Assault Is Reported and Title IX Investigation Begins.**

6              On July 5, 2022, Ashley spoke to a PCC Deputy Title IX Coordinator, Joy Hall,

7    and reported that while she had been working in the office the prior year, Carrillo had touched

8    her breast without her consent, pressured her into engaging in oral sex, sexually harassed her,

9    and became critical of her work when she brushed off his requests for additional sexual favors.

10   [*Id.* ¶ 14].  Ashley also reported possible sexual harassment committed by Carrillo against a

11   former coworker.  [*Id.* ¶ 15].  Three days later, Ashely was interviewed by another PCC Deputy

12   Title IX Coordinator, David Rucker, in Hall's presence.  [*Id.* ¶ 18].  Ashley, again, reported she

13   had been forced into unwanted sexual contact with Carrillo in the workplace, and had been

14   sexually harassed by Carrillo.  [*Id.* ¶ 19].

15             Three days after Ashley's initial report, she and Deputy Title IX Coordinator

16   Hall met with Carrillo and Fonseca to discuss their decision to rescind her remote work status.

17   [*Id.* ¶ 20].  At Hall's suggestion, the order was retracted and reissued to apply to the entire

18   department.  [*Id.* ¶ 21].

19             **C.    Criminal Investigation Begins.**

20             On July 14, 2022, the Pima Community College Police Department ("PCCPD")

21   received a call reporting a possible sexual assault involving Carrillo. [*Id.* ¶ 22]. This triggered a

22   criminal investigation, independent of PCC's Title IX investigation. [*Id.* ¶ 22]. Given the

23   obvious employment and employee conduct implications, Chief Nieuwenhuis communicated

24   the report to Deputy Title IX Coordinator Rucker.  [*Id.* ¶ 23].

25             Officer ("Ofc.") Montano and Corporal ("Cpl.") Carranza investigated the

26   reported sexual assault.  [*Id.* ¶ 24].  They first interviewed Ashley, who disclosed that Carrillo,

27   her superior, had engaged in nonconsensual sexual contact with her in the office.  [*Id.* ¶ 25].

28

116529535.2

Subsequent interviews conducted later that day supported Ashley's report that Carrillo had engaged in improper, prohibited conduct in the workplace.[1]  [*Id.* ¶ 26].

On July 15, 2022, Cpl. Carranza and Ofc. Montano went to Carrillo's office to speak to him.  [*Id.* ¶ 27].  The two officers were already in the open entry area when Carrillo arrived that morning.  [*Id.* ¶ 28].  Carrillo agreed to speak to the officers who simply told him, "We need to talk to you."  [*Id.* ¶ 29].  Needing a more private space than that afforded by Carrillo's office, the officers proposed they speak in the conference room of the president's office at Northwest Campus, which was only a few minutes' walking distance from Carrillo's office.  [*Id.* ¶ 30].  As they walked, the officers tried to make small talk, refraining from discussing the reason they wanted to speak to Carrillo.  [*Id.* ¶ 31].

When they arrived at the conference room, Carrillo sat in a chair on the side of the table closest to the door, and the two officers sat at the opposite side of the table. [*Id.* ¶ 32]. Before asking Carrillo any questions, Cpl. Carranza advised Carrillo he was free to leave at any time, however, Carrillo responded, "No, I'm not gonna, I'm not gonna leave, you're fine." [*Id.* ¶ 33]. Throughout the ensuing interview, the conference room door remained unlocked, and its access unblocked.  [*Id.* ¶ 34].  About halfway through the interview, Carrillo rescheduled another meeting he had set, telling the officers, "Let me, if you don't mind real quick, I have a meeting with the prison right now but what I'm going to do is I'm going to see if they can, if we can reschedule or do something." [*Id.* ¶ 35].  When Cpl. Carranza responded, "That would be great. I appreciate it," Carrillo averred, "Yeah. No problem. **_I don't mind talking to you guys_**."  [*Id.* ¶ 36].

During the meeting Ofc. Montano was given a Trespass Notice to be served on Carrillo.  [*Id.* ¶ 37].  The Trespass Notice, which was issued by Chief Nieuwenhuis, advised

---

[1] PCC employees are prohibited from committing any act that is obscene or profane, and are prohibited from committing sexual harassment or contributing to an offensive hostile environment. [*Id.* ¶ 16].  At the time of Carrillo's employment, PCC had instituted prevention and complaint procedures relating to reports of discrimination, harassment, and retaliation. [*Id.* ¶ 17].

Carrillo that based on the nature of the allegations, he was being immediately trespassed from all PCC properties under A.R.S. § 12-502, and required pre-approval from college police to be on PCC property.  [*Id.* ¶ 38]. It did not, however, charge Carrillo with any crime, and simply restricted his physical access to college properties given the nature of the allegations the police were investigating.  [*Id.*].  Chief Nieuwenhuis issued the Notice based on the allegations of non-consensual sexual conduct between Carrillo and a subordinate employee in the workplace, and Rucker's request that a Trespass Notice be issued as an interim measure.  [*Id.* ¶ 39].  The allegations gave rise to "a concern for the safety of the community," and the Trespass Notice protected the community by removing Carrillo from the premises on an interim basis, while allowing Human Resources time to determine how to proceed with Carrillo and develop any continuing working criteria. [*Id.* ¶ 40].

When the officers served Carrillo with the Trespass Notice, they explained that he was not under arrest, was not being detained or punished, and was simply being removed from the premises as a safety measure while the investigation was being conducted.  [*Id.* ¶ 41]. They then concluded the interview, accompanied Carrillo back to his office so he could retrieve his personal items, and watched Carrillo as he walked to his car and left the premises. [*Id.* ¶¶ 42-43].  The entire encounter with Carrillo, from the time he arrived in his office and agreed to the interview to the time he walked to his car alone, lasted approximately an hour and twenty minutes to an hour and a half.  [*Id.* ¶ 44].  Although both officers were dressed in service uniforms, they did not remove, display, place their hands on, or reach for their holstered service weapons during the encounter.  [*Id.* ¶ 45].  At no point during the encounter did either officer display, reach for, or remove the taser, mace, or handcuffs located on their service belt.  [*Id.* ¶ 46].  Additionally, at no point during the encounter did either officer physically touch Carrillo or attempt to physically prevent him from leaving.  [*Id.* ¶ 47].

Following service of the Trespass Notice, Carrillo continued to work remotely. [*Id.* ¶ 48].  Four days after the Trespass Notice was issued, Carrillo was advised by the PCCPD that it had been rescinded, and that any further restrictions to him were outlined in the Notice of Emergency Removal document issued by Human Resources. [*Id.* ¶ 49].

116529535.2

1          **D.     Title IX Investigation Continues.**

2          After meeting with a Behavior Assessment Team comprised of eight PCC

3   employees from different specialties, Deputy Title IX Coordinator Rucker drafted a Notice of

4   Emergency Removal.  [*Id.* ¶ 50].  At that point in time, Ashley had decided to file a formal

5   complaint against Carrillo.  [*Id.* ¶ 51].  Rucker testified that the Emergency Removal was put

6   in place not only to protect students and staff, but also to help protect Carrillo.  [*Id.* ¶ 50].

7          The Emergency Removal notice informed Carrillo that the Behavior

8   Assessment Team had determined that he posed an immediate threat to the physical health or

9   safety of Ashley and others, warranting an Emergency Removal. [*Id.* ¶ 52].  The Emergency

10  Removal allowed Carrillo to continue working remotely but prohibited him from entering any

11  PCC campus except for the limited reasons permitted, and required him to copy two

12  supervisors on any phone call or email with anyone at PCC.  [*Id.* ¶ 53].  The Emergency

13  Removal notice also advised Carrillo of his right to request an expedited review of the

14  Emergency Removal, and the procedures that would be implemented if he did. [*Id.* ¶ 54].

15         Carrillo subsequently asked PCC's Title IX Coordinator to review the

16  Emergency Removal and loosen its restrictions.  [*Id.* ¶ 55].  On July 27th, less than two weeks

17  after the Trespass Notice was served on Carrillo, and a mere nine days after he was sent the

18  Emergency Removal, PCC held an Expedited Review Meeting, at which Carrillo *and* his

19  personal attorney were present and in which they participated.  [*Id.* ¶ 56].  Although PCC

20  granted Carrillo's request to alter the two-supervisors requirement, it declined to allow him to

21  complete ancillary activities and limited him to his core job responsibilities (which did not

22  include teaching). [*Id.* ¶ 57].  The restriction on Carrillo's desire to teach was imposed based

23  on concerns that, in light of the allegations, Carrillo might engage in inappropriate

24  communications with students.  [*Id.* ¶ 58].

25         On January 25, 2023, PCC sent Carrillo a Notice of Intent to Terminate which

26  placed him on paid administrative leave, pending a decision.  [*Id.* ¶ 62].  The notice laid out

27  each of the Title IX violations[2] and violations of College Policy and the Employee Code of

28  _____

[2] On January 25, 2023, following an evidentiary hearing before an independent Hearing Officer
at which Carrillo was represented by counsel and allowed to cross examine witnesses, the Title

1   Conduct which the Notice was based on, and provided Carrillo an opportunity to respond to

2   the issues laid out in the Notice before a final decision was made.  [*Id.* ¶ 63].  On February 8,

3   2023, Carrillo was sent a notice of PCC's decision to terminate his employment, which advised

4   him of each violation and the information supporting the termination decision.  [*Id.* ¶ 64].

5   Carrillo exercised his right to have the termination decision reviewed, and on May 1, 2023, the

6   Appeal Panel denied his appeal, affirming the termination.  [*Id.* ¶ 65].

7   **II.     PLAINTIFF'S CLAIMS FAIL AS A MATTER OF LAW AND BASED ON**
8          **THE UNCONTROVERTED FACTS.**

        **A.     Plaintiff Failed to Carry His Burden of Proving Any Constitutional**
9              **Violation Occurred.**

10              Plaintiff alleged federal § 1983 claims against PCC and four individual

11  defendants, contending (1) Defendants Nieuwenhuis, Carranza, and Montanao violated his

12  Fourth Amendment rights when Carranza and Montano seized and interrogated him on July

13  15, 2022, while lacking probable cause to do so [Dkt. 11, ¶¶ 111-17]; (2) PCC and Defendant

14  Rucker took Plaintiffs' property without due process, by imposing a policy reflected in the

15  "Results of Expedited Review Meeting" document which prevented Plaintiff from teaching

16  "one or more classes in the fall semester as an adjunct faculty member" [Dkt. 11, ¶¶ 118-26;

17  DSOF Ex. A, Carrillo Depo. Transcript at *internal* Exhibit 17]; (3) PCC and Rucker violated

18  Plaintiff's due process rights when they restricted his ability to enter PCC's property [Dkt. 11,

19  ¶127-39]; and (4) Carrillo's First Amendment right to freedom of assembly was violated

20  through the Trespass Notice, the Rescinded Trespass Notice, the Draft Notice of Emergency

21  Removal, and Results of Expedited Review Meeting, which prevented Plaintiff from entering

22  PCC's property and thus impeded Plaintiff's ability to conduct research related to his degree

23  and participate in the Chancellor's retreat and All College Day workshops located on PCC's

24  campus.[3]  [Dkt. 11, ¶¶ 127-39].  Each of these claims fails, based on the uncontroverted facts.

25

26

27  IX Hearing Officer determined that Carrillo made "comments of a sexual nature to a female
    subordinate that were severe, pervasive and objectively offensive." [DSOF ¶¶ 59-61].

28  [3] Plaintiff stipulated to the dismissal of Count 1 to his First Amended Complaint, with
    prejudice.  [Dkt. 28].

1

### 1.      No Fourth Amendment Seizure Occurred.

The Fourth Amendment guarantees an individual freedom from unreasonable searches and seizures.  U.S. Const. amend. IV.  It is not intended "to eliminate all contact between the police and the citizenry," but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Mendenhall*, 446 U.S. 544, 553-54 (1980) (plurality) (citation and internal quotations marks omitted). "Not all interactions between police officers and citizens implicate the Fourth Amendment." *State v. Canales*, 222 Ariz. 493, 494, ¶ 6 (App. 2009) (citing *Terry v. Ohio*, 392 U.S. 1, 20 n.16 (1968); *State v. Wyman*, 197 Ariz. 10, 13, ¶ 7 (App. 2000)).  "Interaction[s] between law enforcement officials and citizens generally fall[] within three tiers of Fourth Amendment analysis:  "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause."' *United States v. Young*, 105 F.3d 1, 5 (1st Cir. 1997); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991) (consensual encounter does not require reasonable suspicion); *Pierce v. Multnomah Cnty., Or.*, 76 F.3d 1032, 1040 (9th Cir. 1996) (noting investigatory detention is justified by reasonable suspicion of criminal activity, and noting probable cause is only required when detention rises to the level of an arrest).

Consensual encounters do not implicate the Fourth Amendment, and "[i]f there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed." *Florida v. Royer*, 460 U.S. 491, 498 (1983). An encounter remains consensual, as long as a reasonable person could feel free to disregard the police and go about his business. *Bostick*, 501 U.S. at 434 (citation and internal quotation marks omitted). "Absent indicia of force or aggression a request for information is not a seizure or investigatory stop." *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994).

Here, the officers' encounter with Carrillo was consensual because a *reasonable person* would have felt free to leave.  *See California v. Hodari D.*, 499 U.S. 621, 628 (1991) (noting test is objective and is not based on the citizen's subjective perception).  The officers merely

8

1    asked to speak to Carrillo, and he expressly consented to speak to them.  [DSOF ¶¶ 29, 33,

2    35].  Moreover, the officers did not touch Carrillo, physically impede him from walking away,

3    display their service weapons, or use threatening language or a tone of voice indicating

4    compliance with their requests would be compelled. [DSOF ¶¶ 45-47]. The encounter was

5    thus consensual and does not implicate the Fourth Amendment. That the officers'

6    conversation with Carrillo may have elicited evidence of the reported crime they were

7    investigating does not alter the consensual nature of the encounter. Courts have consistently

8    held that no seizure occurs when an officer approaches a citizen and asks questions or makes

9    requests, even when the officer's questions could reasonably be expected to yield evidence of

10   a crime.  *See United States v. Drayton*, 536 U.S. 194, 200 (2002); *Bostick*, 501 U.S. at 434-35, 439;

11   *see also Royer*, 460 U.S. at 497; *United States v. Washington*, 490 F.3d 765, 769 (9th Cir. 2007).

12          Moreover, even if the encounter could be construed as an investigatory

13   detention (which it was not), it still did not violate any Fourth Amendment rights.  The officers

14   had a reasonable, articulable suspicion that a sexual assault had occurred, and that Carrillo had

15   committed the reported offense.  [DSOF ¶¶ 22, 25-26].  The encounter did not rise to the

16   level of a seizure requiring probable cause, because there are no objective indicia of an arrest.

17   The entire interaction lasted less than two hours, involved only two interviewing officers, and

18   occurred in an unlocked conference room where Carrillo remained uncuffed, had telephonic

19   access to the outside world, and was advised he was free to leave.  [DSOF ¶¶ 27-43]. *See United*

20   *States v. Torres*, 732 F. App'x 590, 592 (9th Cir. 2018) (finding seizure was not an arrest where

21   officers moved uncuffed citizen from public area to unlocked private area, while restraining

22   his hands behind he back); *see also United States v. Remy*, 393 F. App'x 427, 429 (9th Cir. 2010)

23   (no custody where two police officers, who did not show their weapons, conducted two-hour

24   interview of citizen in his home, and where citizen had telephonic contact with his wife during

25   the interview).

26          Summary judgment is warranted on Carrillo's Fourth Amendment claim

27   because his consensual interview was not a seizure and no constitutional violation occurred.

28

9

2.     **No First Amendment Violation Occurred.**

"The First Amendment does not guarantee access to property simply because it is owned or controlled by the government."  *Kaplan v. Cnty. of Los Angeles*, 894 F.2d 1076, 1079 (9th Cir. 1990).  Instead, "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue."  *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 44 (1983).  Forum analysis has traditionally divided government property into three categories: traditional public fora, designated public fora, and nonpublic fora.  *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 679 n.11 (2010). Whereas restrictions on First Amendment rights in public forums (such as "public streets and parks") and designated public fora ("government property that has not traditionally been regarded as a public forum [but] is intentionally opened up for that purpose") are subject to strict scrutiny, restrictions on First Amendment rights in limited public fora ("limited to use by certain groups or dedicated solely to the discussion of certain subject") are permitted so long as they are "reasonable and viewpoint-neutral."  *Id.* (citations omitted).

Here, PCC's property—comprised of "any College Campus, building, or grounds owned, leased, operated, or controlled by the College, as well as any structures, improvements, or equipment thereon"—was, at most, a limited public forum.  [DSOF Ex. A, Carrillo Depo. Transcript, at *internal* Exhibit 4 (Employee Handbook); Ex. C, AP 2.03.01]  *See id.*; *see also Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 680 (1992) (forum is not "public" merely because members of public are permitted freely to visit); *see also County of Allegheny v. ACLU*, 492 U.S. 573, 600 n.50 (1995) (courthouse is nonpublic forum despite public access); *United States v. Albertini*, 472 U.S. 675, 685 (1985) (opening base to public does not create public forum). Thus, any restrictions on campus access did not violate the First Amendment so long as they were reasonable and viewpoint neutral. *Christian Legal Soc'y*, 561 U.S. at 679 n.11.  Nevertheless, even if the college properties were considered public or designated public fora, the assembly restrictions at issue here survive strict scrutiny because they were narrowly tailored to serve a significant and/or compelling government interest.  *See*

1   *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1140 (9th Cir. 2011).[4]

2           PCC's Sexual Harassment policies permitted the College to "immediately

3   remove" any student, employee, or community member from college property and any college

4   sponsored activities if: (1) the individual was alleged to have engaged in prohibited

5   discrimination or harassment; and (2) the college determined that individual presented an

6   immediate threat to the health or safety of the college community or a significant risk of

7   substantial disruption to ordinary college operations.  [Ex. C, at PCCC000311-12].  These

8   access restrictions were viewpoint neutral, as they were not based on any contention that the

9   allegations of discrimination or harassment were meritorious.  [*See, e.g.*, Ex. A, Carrillo Depo.

10  Transcript, at *internal* Exhibits 16 (Trespass Notice, noting removal was based on nature of the

11  alleged allegations), 17 (Results of Expedited Review Meeting, stating "these interim measures

12  should not be interpreted or seen as a determination of responsibility or a sanction against

13  you. Instead, they are intended to protect everyone within the Pima community, including

14  yourself"); Ex. B, Rucker Depo. Transcript, at *internal* Exhibit 2 (Emergency Removal stating

15  same position)].  They were also reasonable, as they were implemented as a safety measure, to

16  ensure the protection of both the alleged victim and alleged perpetrator, during the course of

17  any investigations.  [DSOF ¶¶ 38-41, 52-54, 56-58; *see also* Ex. A, Carrillo Depo. Transcript, at

18  11:22-12:10 (agreeing an employer cannot ignore complaints that an employee has behaved

19  unprofessionally, and needs to conduct an investigation, speak to both parties, and keep the

20  parties separate until the issue is resolved)].

21           Courts have recognized a "strong and legitimate" governmental interest "in

22  preventing the harassment of individuals," that is unrelated to the suppression of any First

23  Amendment right.  *See United States v. Shepard*, No. CR 10-1032-TUC-CKJ, 2012 WL 113027,

24  at *10 (D. Ariz. Jan. 13, 2012).  They have also recognized as significant, the governmental

25  interests in protecting public health and safety and curtailing sexual crimes.  *Clark v. City of*

26  *Lakewood*, 259 F.3d 996, 1015 (9th Cir. 2001).  The restrictions on Carrillo's access to college

27

28  _____

[4] This Court need not decide whether the properties at issue were public, designated public, limited public, or non-public fora, as the restrictions imposed were constitutional both under the strict scrutiny analysis and reasonable and content neutral analysis.

property were imposed after he was alleged to have committed sexual assault, and were aimed at protecting both him and the alleged victim.  [DSOF ¶¶ 38-41, 52-54, 56-58].  The restrictions were also narrowly tailored.  The purpose of the restrictions was to ensure the safety of all campus members during investigations of alleged discrimination and harassment.  They were only imposed as a protective measure while the investigation was pending.  Moreover, they allowed Carrillo to continue working and allowed him to enter the campus if specific criteria were satisfied.   Accordingly, the removal policy, as applied, did not violate the First Amendment.[5]

**3.      No Due Process Violation Occurred During the Investigations.**

*i.   Carrillo Did Not Have a Vested Property Right in The Un-Earned Adjunct Salary.*

"Property has been defined as 'any vested right of any value.'"  *See Aranda v. Indus. Comm'n of Arizona*, 198 Ariz. 467, 471, ¶ 17 (2000) (citation omitted).  "A property right "vests" when every event has occurred which needs to occur to make the implementation of the right a certainty."  *Id.* ¶ 18; *see also Piqua Branch of State Bank of Ohio v. Knoop*, 57 U.S. 369, 408 (1853) ("Rights do not vest until all the conditions of the law have been fulfilled with exactitude during its continuance, or a direct engagement has been made, limiting legislative power over and producing an obligation").  A right that depends "upon the continued existence of the present condition of things until the happening of some future event" is "expectant," rather than "vested." *Pearsall v. Great N. Ry. Co.*, 161 U.S. 646, 673 (1896).  "It is only when rights have vested under laws that the citizen can claim a protection to them as property." *Piqua Branch*, 57 U.S. at 408.

Here, Carrillo maintains that he had been hired to teach two classes as an adjunct faculty member in the Fall of 2022 and was deprived of his property interest (his employment interest) without due process, when Rucker restricted his ability to teach those

---

[5] Although Plaintiff alleged the restrictions prevented him from conducting research related to his degree [Dkt. 11, ¶ 133], he stated, in his July 2022 interview, that he had "just finished [his] Doctor's degree," and had already defended his dissertation. [Ex. D, Carrillo Interview Transcript, at PCC000599A-600A; *see also id.* at PCC000615A ("I've been working on my doctorate, doctoral degree for over five years, two years dissertation. I just defended in late June so I'm a full doctor now…")].

1   courses in the "Results of Expedited Review Meeting" document. [Dkt. 11, ¶¶ 118-26; DSOF

2   Ex. A, Carrillo Depo. Transcript, at 174:6-176:9]. Yet when he was restricted to conducting

3   his core work duties in the Results of Expedited Review Meeting [Ex. A, Carrillo Depo.

4   Transcript, at *internal* Exhibit 17], issued in the summer of 2022, he had not yet taught the

5   classes.  He has also not identified any vested interest in his attendance at the Chancellor's

6   retreat or All College Day workshops.  Consequently, the restrictions merely limited, at most,

7   an expectant property interest and not a vested one.  As a result, the limitation on his future

8   ability to teach as an adjunct faculty member did not deprive him of any constitutionally

9   recognized property interest.

10                    *ii.   Carrillo Was Afforded Due Process.*

11                    "Constitutional due process requires that a party affected by government action

12   be given 'the opportunity to be heard at a meaningful time and in a meaningful manner.'"

13   *Miranda v. City of Cornelius*, 429 F.3d 858, 866–67 (9th Cir. 2005) (citation omitted).  Courts

14   consider several factors in determining what process is due, such as: (1) "the private interest

15   that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such

16   interest through the procedures used, and the probable value, if any, of additional or substitute

17   procedural safeguards"; and (3) "the Government's interest, including the function involved

18   and the fiscal and administrative burdens that the additional or substitute procedural

19   requirement would entail." *Id.* (citation omitted).

20                    Here, even assuming *arguendo* Plaintiff had any vested interest in teaching as an

21   adjunct and attending the Chancellor's retreat and All College Day workshops, he was not

22   deprived of those rights without due process.  The Results of Expedited Review Meeting was

23   issued after Carrillo voluntarily spoke to police and reported his version of events; was advised

24   of and exercised his right to request an expedited review of the Emergency Removal; and

25   participated in an Expedited Review Meeting with his attorney present, and at which he was

26   afforded an opportunity to be meaningfully heard.  [DSOF ¶ 54-56 & Ex. N].  These

27   procedures afforded Plaintiff an adequate opportunity to be heard on the scope of the

28   restrictions placed during the investigation.  Moreover, given the significant governmental

                                                  13

1  interest in preventing sexual assault and sexual harassment, the procedures followed ensured

2  public health and safety, while allowing Plaintiff to be heard meaningfully.  Indeed, that the

3  scope of the restrictions was amended *after* Plaintiff was heard, demonstrates the efficacy of

4  the procedures in minimizing the risk of any erroneous deprivation of any interest Carrillo

5  had.  In short, Carrillo was afforded constitutionally adequate due process before his access to

6  PCC properties and ability to teach as an adjunct faculty member were restricted.

7  **B.**   **Plaintiff Failed to Produce Evidence Supporting His *Monell* Claim.**

8  "A government entity may not be held liable under 42 U.S.C. § 1983, unless a

9  policy, practice, or custom of the entity can be shown to be a moving force behind a violation

10  of constitutional rights."  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing

11  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  To establish a *Monell* claim, "a plaintiff

12  must prove "(1) that [the plaintiff] possessed a constitutional right of which he was deprived;

13  (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to

14  the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the

15  constitutional violation."  *Id.* (citing *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432,

16  438 (9th Cir. 1997)).  Here, Plaintiff cannot carry his burden of proof.

17  First, under 42 U.S.C. § 1983, absent a constitutional violation, the defendant

18  cannot be held liable as a matter of law. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986);

19  *see also Monell*, 436 U.S. at 691. As set forth above, because Plaintiff suffered no constitutional

20  violation by Defendants, summary judgment is appropriate on Plaintiff's *Monell* claim. *See Daily*

21  *v. City of Phoenix*, 2017 WL 6527298, at *9 (D. Ariz. Aug. 8, 2017) *aff'd in part, reversed in part on*

22  *other grounds*, 765 Fed. App'x 325 (9th Cir. 2019).

23  Second, a governmental entity is liable only when the execution of its policy or

24  custom inflicts the constitutional injury. *See Miranda v. City of Cornelius*, 429 F.3d 858, 868 (9th

25  Cir. 2005) ("In order for a municipality to be liable for a section 1983 violation the action

26  alleged to be unconstitutional must implement a policy officially adopted by the

27  municipality."); *Monell*, 436 U.S. at 694 ("[I]t is when execution of a government's policy or

28  custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

14

116529535.2

1    represent official policy, inflicts the injury that the government as an entity is responsible under
2    § 1983"). Plaintiff has failed to carry his burden of producing evidence of any policy,
3    procedure, or practice that applied to officers' consensual encounters with members of the
4    PCC community, much less one that was the moving force behind any alleged injury. Indeed,
5    Officer Carranza testified that PCCPD did not have any policies or procedures on how to
6    conduct questioning during an interview. [Ex. F, Carranza Depo. Transcript, at 45:5-9].

7            Third, Plaintiff has also failed to identify any policy which amounts to deliberate
8    indifference of any constitutional right. The policies and procedures PCC implemented in
9    investigating allegations of sexual assault and sexual harassment did not amount to a deliberate
10   indifference of any constitutional right to assembly or due process. The policies afforded
11   substantial opportunities for alleged perpetrators to be heard, and permitted an Emergency
12   Removal to be issued *only* where the individual alleged to have committed the offense
13   presented an immediate threat to the health or safety of the College community. [Ex. C].

14           Accordingly, Plaintiff's failure to produce evidence sufficient to carry his burden
15   of proof on his *Monell* claim requires its dismissal.

16   **III.   DEFENDANTS RUCKER, NIEUWENHUIS, MONTANO, AND**
17          **CARRANZA ARE ENTITLED TO QUALIFIED IMMUNITY.**

18           The defense of qualified immunity requires judgment in favor of a government
19   employee unless the employee's conduct violates "clearly established statutory or
20   constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,
21   457 U.S. 800, 818 (1982). The defense is designed to protect "all but the plainly incompetent
22   or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). If
23   reasonable officers could disagree on whether the defendant's conduct was lawful, immunity
24   applies. *Reynolds v. County. of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996), *overruled on other*
25   *grounds by Acri v. Varian Assocs., Inc.*, 114 F.3d 999 (9th Cir. 1997)). Clearly established law
26   "must be particularized to the facts of the case," and "should not be defined at a high level of
27   generality." *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (cleaned up); *see also City of Tahlequah v.*
28   *Bond*, 142 S. Ct. 9, 11–12 (2021) ("We have repeatedly told courts not to define clearly
     established law at too high a level of generality."); *Shafer v. County of Santa Barbara*, 868 F.3d

                                               15

1110, 1117 (9th Cir. 2017) (a right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law"). "[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (citation omitted). "The 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018); *see also Moore v. Garnand*, __ F.4th __, No. 22-16236, 2023 WL 6331061, at *5 (9th Cir. Sept. 29, 2023).

"[T]hus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (cleaned up); *Ventura v. Rutledge*, 978 F.3d 1088, 1091 (9th Cir. 2020) (stating same). Where a plaintiff fails to meet the burden of showing that conduct violated clearly established law, Defendants are entitled to qualified immunity. *Moore*, 2023 WL 6331061, at *7 ("Because Plaintiffs fail to meet their burden of showing that Defendants' investigatory conduct violated clearly established law, Defendants are entitled to qualified immunity . . . .").

Here, Plaintiff is required to identify a case that squarely put Chief Nieuwenhuis, Cpl. Carranza, Ofc. Montano, and Rucker (a public employee) on notice that their interview of Carrillo, orders restricting his access to PCC properties, and procedures implemented during their investigations, would violate Plaintiff's Fourth Amendment, First Amendment, or due process constitutional rights. [*See* Dkt. 11, ¶ 2]. *Rivas-Villegas,* 142 S. Ct. at 8. He cannot do so, given Defendants' conduct complied with the Constitution. Accordingly, all four individual defendants are entitled to qualified immunity.

## IV.   **CONCLUSION.**

For the foregoing reasons, Defendants respectfully requests that this Court grant summary judgment on Plaintiff's claims.

116529535.2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED this 3rd day of January, 2024.

JONES, SKELTON & HOCHULI, P.L.C.


By /s/ Georgia A. Staton
    Georgia A. Staton
    Ravi V. Patel
    Elizabeth B. N. Garcia
    40 N. Central Avenue, Suite 2700
    Phoenix, Arizona 85004
    Attorneys for Defendants Pima County
    Community College District; Michelle
    Nieuwenhuis, an adult individual; Alex
    Carranza, an adult
    individual; Amy Montano, an adult
    individual; David Rucker, an adult individual

17

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on this 3rd day of January, 2024, I caused the foregoing

3  document to be filed electronically with the Clerk of Court through the CM/ECF System for

4  filing; and served on counsel of record via the Court's CM/ECF system.

5

6  /s/ Ginger Stahly

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

116529535.2